IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROBERT J. MORRIS,

                    Plaintiff,                   OPINION AND ORDER

    v.

                                         15-cv-302-wmc

FORD MOTOR COMPANY,

                    Defendant.

---

Robert J. Morris had worked for Ford Motor Company for forty-six years until his retirement in March 2016.  He now asserts claims against his former employer under the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA" or "ADA"), 42 U.S.C. § 12101, *et seq.*, and the Age Discrimination Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*  The court will now grant defendant's motion for summary judgment (dkt. #13), finding that plaintiff has failed to put forth sufficient evidence to support a jury verdict on either claim.

UNDISPUTED FACTS[1]

**A.  The Parties**

The plaintiff, Robert Morris, is sixty-nine years old.  Originally hired to load trailers in September 1968, Morris was elected to a full-time leadership position with the United Autoworkers Union ("UAW") in 1971.  He held that same position through May 2014, some forty-three years.

---

[1] Unless otherwise noted, the court finds the following facts to be material and undisputed for the purposes of summary judgment.

The defendant, Ford Motor Company, is a Delaware corporation with distribution centers in various locations around the world, including in Menomonie, Wisconsin, where plaintiff worked.  Material to Morris's claims, Chris Williams is the plant manager at the Menomonie distribution center; Charles Gonzales is its human resources representative; and Eric Cuneo is a human resources supervisor.

## B.  Warehouse Specialist Position

On June 2, 2014, Morris began working as a warehouse specialist at one of Ford's high velocity centers ("HVCs") located in Menomonie, Wisconsin.  HVCs are essentially automobile part distribution centers.  When Morris returned, he was the oldest, most senior hourly worker of this "Twin Cities" HVC's approximately twenty-one hourly employees.

Among other things, warehouse specialists are responsible for picking parts, moving things throughout the warehouse and loading trucks.  Central to plaintiff's claims, the job description for a warehouse specialist states that:  "Warehouse employees push and pull conveyances, and they must learn how to properly and safely operate PMHVs [power material handling vehicles]."  (Cuneo Decl., Ex. 2 (dkt. #28-2) 3.)  To operate a PMHV, a warehouse specialist must obtain special licensing, including a physical examination.  Hourly employees complete this physical examination at the beginning of their tenure as warehouse specialists.  The parties dispute how much of the work of a warehouse specialist involves use of a PMHV.

## C.  Morris's Placement on Leave

Morris worked at the Twin Cities HVC from June 2 to June 6, 2014.  On June

5th, Morris met with Dr. Lockheart, a physician that conducts Ford employee physicals, for his PMHV physical. At this PMHV appointment, Morris informed Dr. Lockheart that he had a shoulder condition, having previously been diagnosed with rotator cuff arthropathy of his right shoulder and a massive tear in his rotator cuff by an orthopedic physician, Dr. McNally, before beginning his work as a warehouse specialist. The results from Lockheart's examination confirmed that Morris had right shoulder dysfunction, as well as reduced right eye vision due to macular degeneration. Based on these results, Lockheart determined that Morris was not qualified to operate a PMHV nor to work at heights. Lockheart then filled out an "Ability to Work Report." listing these restrictions, which Ford's medical office received on June 6, 2014.

Morris called Ford's medical office on June 6 to explain his shoulder condition further. During that call, Morris mentioned that his treating physician, Dr. McNally, had conducted an MRI and recommended right shoulder replacement. There is a dispute about whether Morris also volunteered during this call that he barely had use of his arm.

After having several days off, Morris returned to work on June 10. Upon his return, Chris Williams informed Morris that he was being placed on No Work Available medical leave, because he could not obtain a license to operate a PMHV. Morris questioned this decision, believing that there was still work available for him to do, but he claims that Williams said the matter was out of his hands and Charles Gonzales was in charge of the matter.

Morris was placed on unpaid leave effective June 11, 2014. He received approximately ninety-nine dollars per week in Unicare benefits, offset by his Social

Security disability payments. Morris claims that he also asked Gonzales why he was being sent home when there was work for him to do and while other transferees had not even been required to complete the same PMHV exam, but never received a satisfactory explanation.

### D. Efforts to Return to Work

Morris contends that while on unpaid leave, he repeatedly asked to return to work. While there is a factual dispute as to when Ford *first* informed Morris about what he needed to do to come back to work, there is no dispute that by June 24, 2014, Morris knew that he had to receive clearance to return to work from his personal orthopedic and optometric physicians. This is because Ford's human resources department had given Morris a series of instructions by June 24, which explained what he would need to do to be eligible to return to work.

### 1. Series of medical appointments

Even before receiving these instructions, Morris met with his optometrist, Dr. DeLakis, on June 14, 2014, to clarify his vision issues. DeLakis issued a letter stating that he would change Morris's prescription, but that he could work until his new lenses came in. The notes from this appointment, however, did not reference his depth perception, a test used to determine eligibility for PMHV licensing.

On June 17, Morris also met with Ford-affiliated physician, Dr. Lockheart, to determine what he would need to do about his medical conditions to be able to return to work. Lockheart discussed Morris's shoulder limitations with him, completing an Occupational Medicine/Report of Injury/Illness document, in which Lockheart

recommended additional shoulder restrictions.   While Lockheart ultimately cleared Morris for medium level work and recommended weight lifting limits, he did *not* clear Morris for PMHV operation.  Even with Lockheart's clearing of Morris for medium level work, Ford's medical records at the time also indicated that Morris needed to return to his optometrist to have his depth perception evaluated.  When Morris then visited Dr. DeLakis to have his depth perception evaluated, however, he failed the depth perception test again, as he had with Dr. Lockheart.  Ford's medical office received the results of this exam on June 26.

That same day, Morris saw Dr. McNally for an orthopedic appointment.  While McNally released Morris for work "without restrictions," this release did not specifically identify which restrictions no longer applied or reference any of Morris's body parts. More particularly, Ford disputes that McNally examined Morris's shoulder on June 26. Nonetheless, Ford Medical acknowledges receipt of the release on July 9, 2014.

On July 1, Morris saw Dr. Lockheart again.  As he had on June 17, Lockheart identified the same restrictions on Morris as to weight lifting and the medium level of work he should be performing.   On July 8, a supervisor in Ford's human resources department also informed Morris's UAW representative that he still needed to provide documentation from his orthopedic and optometric physicians that cleared him to return to work.

The next day, July 9, Morris obtained a second release from Dr. McNally, expressly releasing Morris "from all restrictions pertaining to his right shoulder."  (Morris Decl., Ex. 6 (dkt. #35-6).)   Still, Dr. Lockheart continued to recommend some

5

restrictions for Morris's shoulder, despite his treating orthopedist McNally having already released him from all right shoulder restrictions.  Morris then contacted Ford's medical office and spoke with a nurse about being cleared for work.  The nurse stated that she still did not have clearance that he had passed his vision test.  Morris then called his optometrist who informed him that his eye condition was permanent and nothing could be done about it.  Morris claims he repeatedly contacted Williams about returning to work but consistently received no answer as to whether Ford would accommodate his disability soon.

### 2.  Functional Capacity Evaluation

A Functional Capacity Evaluation ("FCE") is a physical test, which measures a person's physiological responses to activities analogous to those actually performed on the job.  As an initial matter, there is a dispute about:  (1) whether Morris was informed why he was being required to complete one and (2) whether the FCE was necessary at all.  Plaintiff contends that instead of using an FCE to resolve the difference in opinion between Lockheart and McNally regarding his shoulder restrictions, he should have been referred to an independent specialist.  Nonetheless, Morris was informed that completion of the FCE was a necessary condition to return to work.

On or around July 23, defendant contends that Dr. Lakind, a physician that oversees some of Ford's medical offices, spoke with McNally about the conflict between his full release of restriction and Lockheart's ongoing recommendation of certain restrictions.  On July 29, Lakind scheduled Morris for an FCE on August 14, 2014 -- the earliest available opening -- which he completed with Lynn Weber, an occupational

therapist as scheduled.  During that examination, Weber measured Morris's heart rate and other physiological responses to performing activities like lifting, carrying, and pushing.  The parties also dispute whether the activities that Morris performed during his FCE were actually relevant to his work as a warehouse specialist.   Ultimately, this evaluation noted that Morris could sustain "medium level" work over an eight-hour period.  Ford's medical office updated Morris's file to include:  "Medium work, No driving, No high climbing."  (Lakind Decl., Ex. 2 (dkt. #34-1) 12.)

### E.  Accommodation and Return to Work

On August 19, 2014, after receiving the results of the FCE, Ford's human resources department determined that:  (1) Morris could return to work and perform at the designated level; and (2) he should receive expedited accommodations consistent with ADA requirements.   On August 25, Morris filled out a form requesting accommodation for his disability.  Among other things, this form asked what functions he had difficulty performing.   On it, he indicated that his vision and shoulder impairments would interfere with his ability to work as a warehouse specialist.   Morris also indicated that he would not be able to drive a PMHV in the warehouse, and that returning him to a position requiring no PMHV operation would be a reasonable accommodation consistent with the ADA.

Ford responded by offering Morris the chance to return to work starting August 25, but Morris instead chose to begin on September 2, 2014.  On September 2, Morris began working as a warehouse specialist, with the exception of operating a PMHV.  Plaintiff handled claims in the warehouse, as well as "bin picking."  Ford assigned the

PMHV aspects of Morris's job to another employee.  During the time Morris worked in this capacity, he had no further complaints about his position regarding his eyesight or other physical conditions through February 9, 2016, when Morris retired.

### F.  Younger Employees

Ford has a collective bargaining policy that states while seniority is a factor in assigning jobs, physical requirements of the work are also considered.  (Morris Decl., Ex 9 (dkt. #35-9).)  Because Ford typically assigns jobs based on seniority, plaintiff contends that he should have been assigned to these non-PMHV tasks based on his medical restrictions and length of service as a Ford employee.  In particular, plaintiff identified available tasks that did not require use of a PMHV, such as bin-picking.

Around the same time Morris began working at the Twin Cities HVC, three other individuals -- Jeff Hause, Timothy Kraemer, and Patrick Wiles -- also transferred to the Twin Cities HVS from an assembly plant all with an effective start date of May 19, 2014.  All three transferees were younger than plaintiff, who also claims that they were allowed to work as warehouse specialists for over two months without PMHV licensing, even though he was immediately required to obtain a physical and, as a result, was placed on leave.  Defendant disputes this argument by stating that the transferees passed their PMHV physicals in mid-June -- a month after transferring -- and formally received their PMHV permits in late July.  Even so, each transferee was at least ten years younger than plaintiff.

### G.  Procedural Posture

On September 23, 2014, Morris filed a Charge of Discrimination with the

Wisconsin Department of Workforce Development and the Equal Employment Opportunity Commission. Morris's grievance concerned the decision to place him on "No Work Available" leave. Morris believed that he should have been working during that time and that Ford failed to properly accommodate his disability. Specifically, Morris's grievance alleged that he was placed on leave because he could not obtain a PMHV license.[2] This grievance was ultimately denied.

## OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Factual disputes preclude summary judgment only if the "facts might affect the outcome of the suit under the governing law." *Id.* at 248.

Once the party moving for summary judgment meets the initial burden of showing that it is entitled to relief on the undisputed facts, a nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). This nonmoving party may not "simply show some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the party must produce

---

[2] The parties dispute whether a claim based on the FCE and other allegedly improper medical examinations were implicitly included within Morris's Statement of Discrimination. The court addresses that dispute below.

9

"evidence . . . such that a reasonable jury could return a verdict" in their favor.  *Anderson*, 477 U.S. at 248.

Accordingly, to avoid summary judgment here, Morris bears the burden of responding to Ford's summary judgment motion with sufficient proof of a genuine, material issue of disputed facts on at least one of his claims under the ADA or ADEA. *Celotex*, 477 U.S. at 323 (if the party with the burden of proof fails to come forward with evidence of a material factual dispute "[t]he moving party is 'entitled to a judgment as a matter of law'") (quoting Fed. R. Civ. P. 56(c)).  Here, Morris has failed to meet this burden for the reasons set forth below.

## I.  ADA

Count I alleges two violations of the ADA:  (1) failing to make reasonable accommodations for Morris's known limitations after placing him on unpaid leave from June 11 to August 25, 2014; and (2) requiring him to undergo an unnecessary medical examination (the FCE) in violation of 42 U.S.C. § 12112(d)(4)(A).[3]  The court addresses each in turn below.

### A.  Failure to Accommodate

The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is

---

[3] The defendant also moved for summary judgment on a possible discrimination claim under the ADA, but plaintiff chose not respond to this part of the motion, focusing instead on the failure to accommodate and unnecessary medical examination claims.  To the extent that plaintiff has not intentionally waived this claim, therefore, the court would grant summary judgment to defendant based on plaintiff's failure to put forth evidence that he suffered an adverse action.  *See Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013) (an element of an ADA discrimination claim is proof that the plaintiff suffered an adverse employment action because of his disability).

an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."  42 U.S.C. § 12112(b)(5)(A).  "In order to establish a prima facie case of failure to accommodate under the ADA, 'a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability.'"  *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013) (quoting *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011)).

Defendant contends that plaintiff cannot demonstrate the first and third of these requirements.  With respect to the first requirement, defendant argues that Morris cannot show that he "qualifies" as an individual with a disability because he cannot perform an essential function of the warehouse specialist position, in his case driving a PMHV.  In support, defendant points to compelling evidence that:  (1) all warehouse specialists were required to maintain a PMHV license; (2) all active warehouse specialists, with the exception of Morris, actually did have such a license; and (3) the majority of job functions in the written description of warehouse specialists require operation of a PMHV, among other things.  (Def.'s Br. (dkt. #14) 9-10.)

In response, plaintiff argues that certain of the job assignments of a warehouse specialist did not require operation of a PMHV, at least for portions of a day.  More persuasive, there is no dispute that Ford *was* able to craft an accommodation that did not require driving a PMHV -- a fact that certainly supports, though does not necessarily compel, the reasonable inference that driving a PHMV is not an essential function.  *See*

11

*Shell v. Smith*, 789 F.3d 715, 718 (7th Cir. 2015) ("Although an employer's ability to assign duties to another employee does not make them nonessential, *see Basith v. Cook Cnty.*, 241 F.3d 919, 929 (7th Cir. 2001), it is difficult to see how the duty could be deemed essential at the summary judgment stage when there is no evidence that its reassignment impacted the City's ability to provide dependable transit services to its citizens in an efficient or effective manner, or otherwise created a hardship or burden.").

Of course, the court need not decide if plaintiff has raised a genuine issue of material fact with respect to this first element of his failure to accommodate claim, if the court finds that no reasonable jury could find in favor of the plaintiff on his *prima facie* case -- the failure to provide a reasonable accommodation itself.  Since there is no dispute that Ford ultimately provided Morris with an accommodation -- one that apparently worked out until his retirement a year and a half later -- plaintiff's ability to move on with this claim turns on whether Ford's approximate 75-day delay in securing Morris that accommodation violates the ADA.

"After an employee has disclosed that she has a disability, the ADA requires an employer to 'engage with the employee in an "interactive process" to determine the appropriate accommodation under the circumstances.'" *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)); *see also* 29 C.F.R. App. § 1630.9 ("Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate

reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the individual with a disability.").

The record reflects that Morris was placed on leave on June 11, 2014. By June 24 -- and perhaps well before then based on medical appointments Morris scheduled between those two dates -- the evidence establishes that Morris was given a series of written instructions of what he would need to do before he would be eligible to return to work. Specifically, Morris was required to see his treating physicians, as well as Ford-affiliated doctors, and ultimately sit for an FCE. As the reflected in the undisputed record above, the process for securing the necessary information about his medical conditions was fairly continuous, with no significant gaps in time. Even where there were gaps (*e.g.*, the 2 week wait for an FCE appointment), the delays were not events controlled by defendant.

The court does not doubt that this process may have been frustrating to Morris, but he has failed to put forth sufficient evidence from which a reasonable jury could find that Ford intentionally dragged its feet in securing the necessary information for an accommodation, or otherwise acted in bad faith. Instead, the undisputed facts are that Ford worked to resolve conflicting information about the restrictions, if any, due to his right shoulder condition, as well as gain specific information about his vision by requiring a depth perception test, rather than settle for a more general eye exam.

While case law is limited, those courts that have addressed the issue, including the Seventh Circuit, have found significantly longer delays reasonable, at least absent evidence that would permit a reasonable juror to find the employer was not acting in

13

good faith. *See, e.g.*, *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (finding defendant acted reasonably and in good faith despite 20-month delay in finding a reasonable accommodation); *Clayborne v. Potter*, 448 F. Supp. 2d 185, 192 (D.D.C. 2006) (finding 12-month delay reasonable in light of defendant's efforts, including seeking additional medical information); *Frick v. Local 23 of Int'l, Longshore & Warehouse Union*, No. C12-2224 TSZ, 2014 WL 1047950, at *6 (W.D. Wash. Mar. 14, 2014) (finding several month delay in determining accommodation reasonable in light of ongoing medical evaluation to determine plaintiffs' limitations and accommodations, at least absent "evidence that Defendants were responsible for [any] delays.").

In other words, even lengthier delays of a year or more not caused by a defendant's lack of good faith cannot in and of itself constitute a violation of the ADA. Instead, plaintiff must put forth evidence permitting a reasonable inference that the employer did not act in good faith in engaging in an interactive process. *See Elzeneiny v. D.C.*, 125 F. Supp. 3d 18, 38 (D.D.C. 2015) (collecting cases concerning delay, identifying factors for consideration including "the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith." (quoting *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1262-63 (10th Cir. 2001))). This the plaintiff here has failed to do.[4]

---

[4] While plaintiff notes that the leave was *unpaid*, he does not direct the court to any cases finding that the interactive process must take place while the employee is on paid leave. Regardless, this fact alone, whether viewed in isolation or in combination with the other facts here, does not raise a genuine issue of material fact that Ford was not acting in a good faith effort to find a reasonable accommodation so that Morris could take on a new position as a warehouse specialist.

Instead, plaintiff makes two basic arguments, both of which are red herrings. First, Morris argues that Ford applied the "100% healed" rule, which is not allowed under the ADA. (Pl.'s Opp'n (dkt. #39) 7-8 (citing *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 962 (7th Cir. 2014) ("Indeed Wall's acknowledgment that Mason Point will not retain an employee who has a permanent restriction (a policy sometimes referred to as '100% healed') would if accepted as a defense read 'reasonable accommodation' out of the Americans with Disabilities Act.")).) This argument is unavailing. While Morris was placed on leave because he did not pass his physical examination, there is nothing in the record to reflect that he would not be allowed to work at Ford because of that test result. On the contrary, the record reflects, as detailed above, that Ford continued to attempt to determine the extent of Morris's disability and any related work restrictions, especially with respect to his shoulder, so that he could return to work despite never being 100% "healed." (*See, e.g.*, PFOFs Ex. K (dkt. #16-3) (June 24 list of requiring activities for Morris to return to work either with no restrictions or with restrictions).) Indeed, the fact that Ford crafted an accommodation for him to address his vision impairment undermines any reasonable finding that defendant required Morris to be 100% healed before returning to work.

Second, Morris focuses on his vision impairment, arguing that "[t]he only accommodation Morris ever requested was to be excused from operating a PMHV because of his vision impairment." (Pl.'s Opp'n (dkt. #39) 11.) Plaintiff's reason for framing his claim as such makes sense, since Ford sought the majority of the medical appointments and the required FCE to gain clarity about the extent of Morris's shoulder

15

condition.  As such, Morris's claim based on the delay in securing an accommodation has more traction if it is limited to his disability with respect to his vision.  Like the first, the problem with this argument, however, is it, too, is divorced from the record.  (*See, e.g.*, Morris Decl., Ex. 3 (June 23, 2014, medical release seeking "information pertaining to shoulder condition"); Def.'s PFOF Ex. C (dkt. #16-2) 3 (Aug. 25, 2014, letter from Morris describing driving restriction due to "vision and shoulder impairment"); Def/.'s PFOF, Ex. B (dkt. #16-1) (Sept. 22, 2104, ERD Complaint listing "right shoulder impairment").)  Morris placed his shoulder condition squarely in issue, and no reasonable jury could find otherwise.  Therefore, plaintiff's argument that the jury should only consider his vision impairment in assessing the reasonableness of Ford's efforts in crafting an accommodation falls flat.

### B.  Improper Medical Exam

In addition to the failure to accommodate claim, plaintiff also brings an improper medical exam claim under § 12112(d)(4)(A) of the ADA, which provides:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

As an initial matter, defendant argues that plaintiff failed to exhaust this claim by failing to note it in his ERD complaint.  For a plaintiff to proceed on a claim not raised in an EEOC charge, "there must be 'a reasonable relationship between the allegations in the charge and the claims in the complaint,' and it must appear that 'the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the

allegations in the charge.'" *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010) (quoting *Vela v. Village of Sauk Village*, 218 F.3d 661, 664 (7th Cir. 2000); *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).  Still, "because most EEOC charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Cheek*, 31 F.3d at 500.[5]  As such, the test provides the plaintiff "significant leeway." *Id.*

Here, the statement of discrimination provides in pertinent part:

> Ford Motor Co. refused to reasonably accommodate Mr. Morris' disability, and, instead told him there was no work available for him with his restrictions while at the same time assigning work he could have performed, and to which he was entitled under applicable seniority provisions, to substantially younger, non-disabled employees.

(Def.'s PFOF Ex. B (dkt. #16-1) 5.)   The discrimination statement also describes Morris's requests for accommodations and Ford's refusal to provide such an accommodation.   The statement does not, however, describe any required medical examinations, other than the June 5th examination for purposes of determining his eligibility to obtain a PMHV license.

While the unnecessary medical claim may have grown out of an ERD investigation, one would be hard-pressed to find a reasonable relationship between the allegations in the charge and the unnecessary medical claim in Morris's complaint itself,

---

[5] The exhaustion requirement under the ADA is the same as that under Title VII.  *See Arrigo v. Link Stop, Inc.*, No. 13-CV-437-BBC, 2013 WL 6094581, at *2 (W.D. Wis. Nov. 20, 2013) (noting that both "Title VII and the ADA require plaintiffs to exhaust their administrative remedies" (citing 42 U.S.C. § 2000e–5; 42 U.S.C. § 12117(a); *Teal v. Potter*, 559 F.3d 687, 691–92 (7th Cir. 2009))).

especially in light of the general rule that "each separate act of discrimination must be set out in an EEOC charge before an action can be brought." *Jones*, 613 F.3d at 670. Nevertheless, because this is a close call -- and because the merits do *not* present a close call -- the court will assume that plaintiff exhausted his administrative remedies.[6]

Turning to defendant's challenge on the merits, "an 'examination is job-related and consistent with business necessity when an employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition.'" *Wright v. Ill. Dep't of Children & Family Servs.*, 798 F.3d 513, 522-23 (7th Cir. 2015) (quoting *25 Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009)). "The employer's reasonable belief must be based on objective evidence obtained, or reasonably available to the employer, prior to making a disability-related inquiry or requiring a medical examination. Such a belief requires an assessment of the employee and his/her position and cannot be based on general assumptions." *Id.* at 523 (internal citation and quotation marks omitted).

Unlike plaintiff's failure to accommodate claim, however, the *employer* has the burden of demonstrating that the examination is "consistent with business necessity," and the Seventh Circuit has noted that this burden is a "quite high." *Id.* To make such a showing, there must be "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Id.*

---

[6] "The scope of the EEOC charge limit the scope of the subsequent complaint is in the nature of a condition precedent with which litigants must comply rather than constituting a component of subject matter jurisdiction." *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985).

Despite this high burden, the court concludes that no reasonable jury could find that the FCE was unnecessary in light of undisputed record that Morris's own, existing medical condition precipitated a legitimate inquiry by Ford as already articulated above. *See Pamon v. Bd. of Trustees of Univ. of Ill.*, 483 F. App'x 296, 299 (7th Cir. 2012) (affirming district court's grant of summary judgment to defendant on § 12112(d)(4)(A) claim where the record demonstrated that the FCE was "consistent with [the defendant's] policy" and "would help the employer to make an individualized assessment of [plaintiff's] condition and his ability to do the job"); *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 566 (7th Cir. 2009) (affirming grant of summary judgment to defendant, finding psychiatric evaluation job-related and consistent with business necessity based on colleague's "genuine concern that [firefighter plaintiff's] behavior was uncharacteristic and was adversely impacting her ability to perform her job"); *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1129 (7th Cir. 2006) (affirming grant of summary judgment to defendant based on "undisputed evidence establishes that GM had legitimate concerns about [the plaintiff's] ability to drive safely").  In contrast, cases in which courts have allowed such a claim to proceed to trial involve instances where the reason for the medical exam rested on general concerns about an employee's health without medical, or other credible, evidence to support such a need for an examination.  *See, e.g., Wright*, 798 F.3d at 524 (agreeing that plaintiff's § 12112(d)(4)(A) should go to trial where defendant sought fitness examination based on certain "behaviors" exhibited at work and where defendant required such an exam inconsistently).

Here, there is no reasonable basis to dispute on this record that *Morris* placed the condition of his shoulder in issue, nor that there at least appeared a material, good faith discrepancy between his treating physician and the Ford-affiliated physicians.  As a result, defendant has met its high burden of demonstrating that the FCE was based on a specific, credible concern about Morris's shoulder impairment, as well as that it was reasonably necessary to both understand whether Morris had any work-related restrictions and then to craft an accommodation to address those restrictions.  As such, the court will grant summary judgment to defendant on this ADA claim as well.

## II. ADEA Claim

The ADEA prohibits an employer from discriminating "because of [an] individual's age."  29 U.S.C. § 623(a)(1).  Because Morris was 68 during the summer of 2014, he easily qualifies for protection under the ADEA.  29 U.S.C. § 631(a) (extending its protections to individuals forty and over).  As such, Morris "may avoid summary judgment by providing either direct or circumstantial evidence that would allow a reasonable juror to infer that her employer acted for discriminatory reasons."  *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014).  In particular, under the ADEA, Morris "must produce evidence from which a jury could infer that h[is] age 'was a but-for cause of [his] termination.'"  *Id.* (quoting *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012); citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

Despite this burden, plaintiff's response to defendant's motion for summary judgment identifies three transferees who were at least ten years younger than Morris and who did not have PMHV permits, but nonetheless were allowed to work as warehouse specialists

between May 19 and July 31, 2014.  Certainly, under the indirect method of proof under the ADEA, a plaintiff may identify similarly situated, substantially younger employees who were treated more favorably than he.  *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002) (citation omitted); *see also Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008) ("All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination.  The 'similarly situated' prong establishes whether all things are in fact equal.").

Here, however, plaintiff Morris has failed to offer evidence from which a reasonable jury might find that any of these three individuals were similarly situated to plaintiff.  In particular, the undisputed facts show that unlike plaintiff, all three of them were eligible for a PMHV license, having each passed their physical examinations.[7]

Nevertheless, plaintiff points out that the three workers transferred to the Twin Cities HVS on May 19, 2014 -- before Morris started his work at the plant -- but were not required to sit for a physical examination until June 16 and 17, after Morris's physical examination and after Morris had complained that they were able to work without a PMHV permit while he was not.  Even assuming these facts are true -- and the proposed findings of facts cited by plaintiff in his brief do not provide the support claimed -- plaintiff has still failed to explain how he is similarly situated to these individuals, who, after all, Ford had no reason to doubt their health, unlike plaintiff who

---

[7] Defendant also points out that once they passed their physical examinations, all three individuals were able to apply for PMHV permits and, therefore, were at least qualified for in plant driving.  (Def.'s Resp. to Pl.'s PFOFs (dkt. 44) ¶ 56.)

self-identified with health issues.  Absent that information, plaintiff failed to establish a *prima facie* case of discrimination under the indirect method.[8]  Accordingly, the court will grant summary judgment to defendant on plaintiff's ADEA claim as well.

ORDER

IT IS ORDERED that:

1) Defendant Ford Motor Company's motion for summary judgment (dkt. #13) is GRANTED.

2) The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 15th day of September, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[8] Even if plaintiff had sought to pursue his claim under the direct method, the court is unaware of any evidence in the record from which a jury could reasonably infer that defendant's treatment of Morris during the summer of 2014 was because of his age.